UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

| | : | |
|---|---|---|
| FREDERICK J. CALATRELLO, | : | CASE NO. 1:12-CV-726 |
| Regional Director of Region 8 of the | : | |
| National Labor Relations Board, etc. | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| vs. | : | ORDER & OPINION |
| | : | [Resolving Docs. Nos. 1, 17 & 54] |
| JAG HEALTHCARE, INC., d/b/a GALION | : | |
| POINTE, LLC, | : | |
| | : | |
| Respondent. | : | |
| | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Petitioner Frederick J. Costello ("Petitioner"), Regional Director of Region 8 of the National Labor Relations Board ("NLRB"), seeks an injunction under § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j).  [Doc. 1.]  Respondent JAG Healthcare ("JAG") opposes the petition, and moves to dismiss the petition for lack of subject-matter jurisdiction.  [Doc. 17.]  In considering the petition, this Court considers whether sufficient evidence supports the Petitioner's argument that JAG fired or refused to hire perceived union supporters.  For the reasons stated below, this Court DENIES JAG's motion to dismiss and GRANTS the Petitioner's request for injunctive relief.

I.  Background

This dispute centers around a nursing home's change of operators in mid-2010.[1]  Cardinal Nursing Homes, Inc. ("Cardinal") owned a nursing home facility located at 925 Wagner Avenue in

---

[1] The majority of the facts recited herein are gleaned from the administrative record filed with this Court.  For purposes of clarity and citation consistency, some noncontroversial facts are taken from the Administrative Law Judge's opinion if not subject to objection by either party.

Case No. 1:12-CV-726
Gwin, J.

Galion, Ohio. [Doc. 37-3.] Until June 30, 2010, Cardinal subleased the assets of the facility to a Florida company, 925 Wagner Operating, which operated the nursing home and had named the facility "Village Care Center" ("Village Care"). [Id.] Service Employees International Union, District 1199, WV/KY/OH ("SEIU" or "the Union") represented a unit of the employees at Village Care under a collective bargaining agreement. [Doc. 36-4.]

On June 30, 2010, Cardinal terminated the sublease of assets to 925 Wagner Operating and sublet the assets to Galion Pointe, LLC ("Galion Pointe"), effective July 1, 2010. [Doc. 37-4.] The CEO of Galion Pointe, and the signer on the lease, is James Griffiths. [Id.] Griffiths is also the CEO of Galion Pointe's parent corporation, JAG Healthcare ("JAG" or "the Respondent"). In recent filings, JAG contests that it and Galion Pointe are one and the same, *see* doc. 52, at 1-2, though this assertion is belied by prior filings, *see* doc. 36-3, at 12 ("Respondent acknowledges that on or about June 29, 2010, it executed an Operations Transfer Agreement . . . ."). Regardless, neither JAG nor Galion Pointe contacted the Union to notify it of the operating agreement change. [Doc. 36-7.]

Union Representative Dawn Courtright testified that on June 30, 2010, she received a phone call from a bargaining unit member, Julianne Barnhart, telling her Village Care was changing its structure. [Doc. 35-2, at 57.] Courtright went to the facility, met with Barnhart, and then spoke with Defendant JAG's Chief Executive Griffiths. [Id.] Union Representative Courtright says that Griffith stated the facility would neither recognize nor bargain with the Union. [Id. at 59.] She then attempted to follow Griffiths into an employee "meet-and-greet" but was told she could not attend. [Id. at 61-62.]

Barnhart, however, did attend the meeting. She testified that Griffiths informed the employees at the meeting that he owned a number of nursing homes, "and that none of them are

-2-

Case No. 1:12-CV-726
Gwin, J.

union, none of them will be union," and that there was to be no union solicitation on the premises. [Doc. 35-3, at 617.] Barnhart also recalled Griffith saying that all of the employees would need to reapply for their positions, fill out applications, take drug tests, and go through the interview process. [*Id.* at 619.] Chief Executive Griffiths also distributed a company handbook that included terms and conditions of employment different from those negotiated with the Union. [*Id.* at 624.]

On July 1, 2010, JAG Healthcare initially staffed the facility with 23 employees performing work done in the former collective bargaining unit. Fifteen of these new employees were former Village Care employees. Eight other employees were assigned to Galion Pointe from other JAG Healthcare facilities. Of the 37 employees in the Village Care bargaining unit, JAG hired fifteen. [Doc. 51-1, at 14; doc. 39-10.] Among the former Village Care employees who JAG did not hire, some were called during the June 30, 2010, evening and told not to come to their former jobs while others arrived at work on July 1, 2010, only to discover that they were unemployed. JAG also brought in employees from other locations. [doc. 41-9] The Petitioner insists that this was meant to evade successorship status, while JAG contends that it was to get the new facility up to JAG's standards as quickly as possible.

JAG hired three Village Care employees—Natalie Archer, Tracy Atkins,[2] and Diana Nolen—and then fired them. Predictably, the parties disagree over why each of these persons was fired. The Petitioner insists that these employees engaged in pro-Union activities or conversations, and were terminated for doing so. [Doc. 47, at 14.] JAG contends otherwise—saying the employees were terminated because of a lack of professionalism (Archer), schedule inflexibility (Atkins), or an indifference to patient care (Nolen). [Doc. 48, at 20-21.]

---

[2] Atkins had not been hired in the July 1 round, but was hired back about a week later. [Doc. 51-1, at 16.]

Case No. 1:12-CV-726
Gwin, J.

Between July and September 2010, the Union filed a number of unfair labor practice charges against JAG. [Doc. 1-2, at 2.] The Acting General Counsel of the NLRB consolidated the charges into one action and scheduled a hearing for March 2012. [*Id.* at 14.] On March 26, 2012, the Petitioner filed the instant petition in this Court for § 10(j) injunctive relief. [Doc. 1.] On July 27, 2012, the Administrative Law Judge ("ALJ") filed a decision that found primarily in the Petitioner's favor. [Doc. 51-1.] The Petitioner further moved this Court on October 5, 2012 for an expedited ruling on its petition for injunctive relief. [Doc. 54.] Although aware of the need to quickly resolve this petition for § 10(j) relief, a host of competing demands intruded.

## II. Analysis

Respondent JAG contends that this Court lacks subject-matter jurisdiction over the petition for injunctive relief. In support of this argument, JAG generally says that the NLRB was not properly constituted when it authorized this lawsuit. JAG also disputes the substantive grounds for the injunctive relief. The Court considers both arguments in turn.

*A. Subject-matter jurisdiction*

Under the NLRA, the NLRB is to "consist of five . . .members, appointed by the President by and with the advice and consent of the Senate." 29 U.S.C. § 153(a). To constitute a quorum, the NLRB must be composed of at least three members. *Id.* § 153(b). At the end of 2011, all parties agree that the NLRB had three lawfully-appointed members, and thus had a lawful quorum for the purposes of bringing this action. At some point, either at the end of 2011 or the beginning of 2012, Board Member Craig Becker's *prior* recess appointment expired, leaving the NLRB with only two members. On January 4, 2012, President Obama named three recess-appointments to the NLRB. *See* Joseph Williams, *President Obama Appoints Three to NLRB*, Politico (Jan. 4, 2012, 4:24 PM),

-4-

Case No. 1:12-CV-726
Gwin, J.

http://www.politico.com/news/stories/0112/71086.html.

JAG challenges President Obama's recess-appointments to the NLRB because, JAG alleges, Congress was not actually in recess at the time of those appointments. [Doc. 17-1.] JAG further insists that if those appointments are invalid, then the Board lacked the authority to bring this action. The Board needs this authority to authorize the instant petition. *See* 29 U.S.C. § 160(j) ("The Board shall have power . . . to petition any United States district court . . . for appropriate temporary relief or restraining order."); *see also New Process Steel v. NLRB*, 130 S. Ct. 2635, 2640 (2010) ("[T]he Board quorum requirement . . . requires three participating members 'at all times' for the Board to act."). JAG contends that this Court lacks subject-matter jurisdiction because the NLRB lacked a quorum at the time that the Petitioner sought injunctive relief.[3/]

The Petitioner insists that the Court need not reach this issue. *See Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) (instructing that courts should not decide a constitutional question if there is another ground upon which to dispose of the case). The NLRB, perhaps cognizant of its impending loss of quorum, delegated full litigation authority to its General Counsel. 76 Fed. Reg. 69768-02 (Nov. 9, 2011) ("[T]he Board delegates to the General Counsel full and final authority and responsibility on behalf of the Board to initiate and prosecute injunction proceedings under section 10(j) or section 10(e) and (f) of the Act . . . ."). The delegation, according to the Petitioner, provides an independent basis for subject-matter jurisdiction even if JAG's constitutional challenge were sustained. [Doc. 25.]

---

[3/]JAG's primary argument relies on Federal Rule of Civil Procedure 12(b)(1), but alternatively relies on Rule 12(b)(6). The theory underlying both is the same. This Court will address the motion under the rubric of Rule 12(b)(1). *See Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869 (2010) (distinguishing between Rule 12(b)(1) and Rule 12(b)(6), with the former referring to a tribunal's power to hear a case).

Case No. 1:12-CV-726
Gwin, J.

The Petitioner is correct. The Board's delegation of duties to the General Counsel remains valid even if the Board later loses a quorum. Were this not so, the routine functions of the NLRB would grind to a halt whenever a transition of power took place with more than two members being replaced. This Court is not alone in this position. *See, e.g.*, *Garcia ex rel. NLRB v. S & F Market St. Healthcare, LLC*, 2012 WL 1322888, at *2 n.1 (C.D. Cal. Apr. 17, 2012) ("Thus, it was sufficient that a quorum of the Board in November 2011 delegated decisions as to individual petitions to the General Counsel."); *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 349 (E.D.N.Y. 2012) (agreeing with the Fifth, Eighth, and Ninth Circuits in upholding "the Board's ability to delegate its § 10(j) powers" and that "the delegation to the General Counsel survived the Board's loss of a quorum"). The Respondent's argument relies upon a theory that all of the General Counsel's powers are derivative of the Board's power. However, Congress created the General Counsel's office "in order to avoid the cumbersome device of establishing a new independent agency," and not to be completely dependent upon the Board. *Paulsen*, 849 F. Supp. 2d at 350 (internal quotation marks omitted). *Cf. New Process Steel*, 130 S. Ct. at 2642 n.4 ("Our conclusion that the delegee group ceases to exist once there are no longer three Board members to constitute the group does not cast doubt on the prior delegations of authority to nongroup members, such as the regional directors *or the general counsel*.") (emphasis added).

The Respondent fails to cite to any case in support of its contention other than *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 472 (D.C. Cir. 2009). Although the Supreme Court adopted *Laurel Baye*'s position as to the delegation of power to a delegee group *of the Board*, the Supreme Court specifically did not adopt that case's position as to a delegation to nongroup members. See *New Process Steel*, 130 S. Ct. at 2642 n.4 ("[W]e do not adopt [*Laurel*

Case No. 1:12-CV-726
Gwin, J.

*Baye*'s] equation of a quorum requirement with a membership requirement that must be satisfied or else the power of any entity to which the Board has delegated authority is suspended."). Given the Supreme Court's language, that portion of *Laurel Baye* is of questionable validity, and this Court declines to adopt Respondent JAG's position. Accordingly, the Board's November 2011 delegation to the General Counsel was proper, and this Court has subject-matter jurisdiction to hear this complaint.

B. *The Petitioner's Request for Injunctive Relief*

The NLRB is tasked with determining the merit of an unfair labor practice charge, with that determination subject to review by the appropriate appellate court. *Schaub v. Detroit Newspaper Agency*, 984 F. Supp. 1048, 1051 (E.D. Mich.1997). "But because administrative review can be slow, Congress provided the Board in § 10(j) of the Act with the ability to petition a district court to enjoin alleged unfair labor practices pending Board review of the substantive evidence of those practices." *Calatrello v. "Automatic" Sprinkler Corp. of America*, 55 F.3d 208, 212 (6th Cir.1995). Section 10(j) afford this Court "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

To grant such relief, this Court must make two findings. First, there must be "reasonable cause" to believe that an alleged unfair labor practice has occurred. If such reasonable cause exists, injunctive relief may be afforded if doing so is "just and proper." *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001). The Petitioner has the burden of demonstrating both circumstances. *Schaub v. Detroit Newspaper Agency*, 984 F. Supp. at 1052.

The burden of establishing reasonable cause is "relatively insubstantial." *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d at 969. The Petitioner "need not prove a violation of the NLRA

-7-

Case No. 1:12-CV-726
Gwin, J.

nor even convince the district court of the validity of the Board's theory of liability; instead, he need only show that the Board's legal theory is substantial and not frivolous." *Id.* (quotation omitted). Conflicting evidence does not preclude a finding of reasonable cause if some facts exist that support the Petitioner's theory of liability. *See id.* The district court's decision as to reasonable cause is reviewed only for clear error. *Id.*

The "just and proper" determination is one within this Court's discretion. "Congress allowed for § 10(j) injunctions because in some cases the enforcement of a Board order after the Board's normal processes is ineffective to undo the effects of unfair labor practices." *Calatrello v. Rite Aid of Ohio*, 823 F. Supp. 2d 690, 695 (N.D. Ohio 2011). To make such a finding, this Court "must inquire whether the relief is necessary to preserve the remedial power of the Board," as well as being in the public's interest. *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir. 1988).

*1. Reasonable Cause*

The Petitioner alleges three sets of acts show that JAG engaged in unlawful labor practices. This Court reviews each allegation in turn to determine if there is reasonable cause to afford equitable relief. Further, this Court may take into account the ALJ's reasoning in coming to its own decision, but it does not sit in review of the merits of the ALJ's decision. *See Glasser v. Comau, Inc.*, 767 F. Supp. 2d 778, 788 (E.D. Mich. 2011) ("The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the [Petitioner's] prospects of success may be weighed.") (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001)).

Refusal to Hire

The Petitioner first contends that JAG violated §§ 8(a)(1) and (3) of the NLRA by refusing

Case No. 1:12-CV-726
Gwin, J.

to hire incumbent employees for the purposes of evading successorship status and by discharging three employees in retaliation for their union activities. In relevant part, Section § 8(a)(3) states that it is unlawful for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). In support of this claim, the Petitioner points to JAG's hiring of only 15 of the 37 members of Village Care's bargaining unit, as well as JAG's termination of employees Archer, Atkins, and Nolen. [Doc. 47 at 18-19.]

To establish a violation of § 8(a)(3) in the successorship context, the Petitioner has the burden to prove that the employer failed to hire employees of its predecessor and that it did so out of anti-union animus. *Planned Bldg. Servs., Inc.*, 347 N.L.R.B. No. 64, 2006 WL 2206975, at *7 (2006). Factors to be considered include "substantial evidence of union animus; lack of a convincing rationale for refusal to hire the predecessor's employees; inconsistent hiring practices or overt acts or conduct evidencing a discriminatory motive; and evidence supporting a reasonable inference [that the owner sought] to avoid the Board's successorship doctrine." *Id.*

There is reasonable cause to believe that JAG violated § 8(a)(3). As the ALJ identified, JAG terminated a number of bargaining unit members on June 30, 2010, but then brought in 8 employees from other facilities to fill some of those positions on July 1, and brought in 4 more employees from July 2 to 5. [Doc. 51-1, at 15.] The illogic of not rehiring experienced workers and the illogic of substituting workers from other distant facilities–where their presumptively value adding work would be lost–seems obvious. JAG also brought in 7 of its own Healthcare supervisors to perform bargaining unit work during this time. [*Id.*]; *see also U.S. Marine Corp.*, 293 NLRB 669, 671 (1989) (animus demonstrated by not contacting predecessor's qualified employees when hiring additional

Case No. 1:12-CV-726
Gwin, J.

employees). Further, there is evidence in the record that JAG terminated some employees, like Nolen, for having conversations with other employees about the Union. [Doc. 35-5, at 1024.]

JAG leadership is also alleged to have engaged in overt acts demonstrating antiunion animus. In rejecting union requests to discuss the transition, Chief Executive Griffiths emphasized that no other JAG facilities were unionized. [Doc. 35-6, at 1608.] This statement was reinforced at the meet-and-greet at Galion Pointe, where testimony demonstrates that Griffith stated that he did not believe that union representation was necessary. [Doc. 51-1, at 13.]

In response, JAG argues that its hiring decisions were made based on census, patient acuity, and budgetary restraints. [Doc. 48, at 20.] This statement boggles the mind, considering the evidence in the record demonstrating that the JAG's staffing decisions were not made with such care. *See, e.g.*, Doc. 35-2, at 258-69 (discussing hiring process during condensed timeframe). Moreover, the types of arguments that JAG makes in response are inappropriate for this setting—this Court is not charged with making findings of fact based on conflicting evidence. Rather, it must ensure that the Petitioner's theory for liability has some basis in the record and is not frivolous. With regards to the § 8(a)(3) violation, he has done so.

### Non-solicitation rule

The Petitioner next contends that JAG violated § 8(a)(1) of the NLRA by establishing an overbroad rule prohibiting employees from discussing the Union. Section 8(a)(1) makes it unlawful "to interfere with, restrain, or coerce employees in the exercise of the rights" to organize, join or assist unions, bargain collectively, and engage in collection action. 29 U.S.C. § 158(a)(1). This section makes it "illegal for an employer to make statements or threats that, when considered from the employees' point of view, would have a reasonable tendency to coerce employees in the exercise

Case No. 1:12-CV-726
Gwin, J.

of their rights" to engage in protected activities. *Lund v. Case Farms Processing, Inc.*, 794 F. Supp. 2d 809, 818 (N.D. Ohio 2011).

Respondent JAG distributed a handbook to Galion Pointe employees that included the following restriction: "During work time, each associate is to be occupied with his or her assigned responsibilities. Engaging in the distribution of literature during work time or in working areas or soliciting support of other associates for any group, cause or product on work time is prohibited." [Doc. 51-1, at 33.] In response, JAG asserts that the non-solicitation policy is non-discriminatory—that is, that it applies to both union and nonunion activities. [Doc. 48, at 22-23.] The policy, however, cannot be considered alone. When coupled with Chief Executive Griffith's statements outlined above and directions requiring personnel to call the police should union organizers come on the premises [doc. 35-3, at 639], reasonable cause to afford the requested relief has been shown.

The Petitioner's final contention is that JAG violated §§ 8(a)(5) and (1) of the NLRA by unilaterally changing terms and conditions of employment. Section 8(a)(5) makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees . . . ." 29 U.S.C. § 158(a)(5). Although employers are free to set initial terms and conditions of employment, they may not do so when they have engaged in unfair labor practices to avoid becoming a successor employer. *See Love's Barbecue Restaurant*, 245 NLRB No. 17 (1979) ("Here, any uncertainty as to what Respondent would have done absent its unlawful purpose must be resolved against Respondent, since it cannot be permitted to benefit from its unlawful conduct."); *see also Advanced Stretchforming Int'l, Inc.*, 323 NLRB No. 84 (1997) (declaring that employer's statement there would be no union is probative as to whether a company engaged in unlawful conduct such that it

Case No. 1:12-CV-726
Gwin, J.

cannot set initial terms of employment).

JAG contends that the presumption outlined in *Love's Barbecue* has been rejected by the Sixth Circuit in *Kessel Food Markets, Inc. v. NLRB*, 868 F.2d 881, 889 (6th Cir. 1989). While true that *Kessel* disagrees with some of *Love's Barbecue*, it did not take position on the issue here. In *Kessel*, the new employer would not have been a successor employer *even if* it had retained all of the predecessor's employees—the predecessor employees would not have constituted a majority of the workforce. *See id.* ("[I]f Kessel had hired all the ex-Kroger employees who applied for positions . . . neither Kessel's meat nor non-meat units would have contained a majority of ex-Kroger employees."); *see also Cobb v. Contract Transp.Inc*, 452 F.3d 543, 553 (6th Cir. 2006) (discussing the successorship doctrine). Had JAG hired all of its predecessors employees, those employees would constitute a majority of Galion Pointe's workforce and there would thus be "substantial continuity of identity in the business enterprise." *Cobb*, 452 F.3d at 553 (quoting *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 263 (1974)). The only other case that JAG cites in support of this proposition, *Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495 (6th Cir. 2002), does not speak to whether an employer can set up initial terms of employment when it has engaged in unfair labor practices to avoid successor status.

The Petitioner has provided non-frivolous evidence supporting his theory of liability with respect to alleged violations of § 8(a)(1) and § 8(a)(3). These unfair labor practices, in turn, provide an inference that JAG improperly changed terms of employment, in violation of § 8(a)(5). This Court finds reasonable cause necessary to afford equitable relief to the Petitioner.

*2. Just and Proper*

When considering whether the granting of equitable relief, this Court must consider whether

Case No. 1:12-CV-726
Gwin, J.

the Board's remedial powers "would be ineffective without a court order temporarily returning the protagonists to the positions they occupied before occurrence of the alleged unfair labor practice . . . ." *Schaub v. Detroit Newspaper Agency*, 154 F.3d at 279. The Petitioner asserts the following arguments in support of his position: an interim order requiring the parties to bargain would protect employees' rights; interim relief is necessary to ensure that employee support for the Union does not erode; JAG's bargaining position strengthens the longer it can enjoy the fruits of its unlawful conduct; interim relief would help maintain the efficacy of any ultimate Board order; and finally, that interim relief would remove the chilling effect of JAG's previous conduct. [Doc. 47, at 24-25.]

The Respondent points to the delay between the date of the alleged unlawful conduct and the filing of this request for injunctive relief. The alleged conduct occurred in mid-2010, yet the Petitioner did not file the instant petition with this Court until March 26, 2012—a delay of more than a year and a half. JAG also points to the lack of evidence of any ongoing infractions. [Doc. 48, at 11-13.]

What JAG does not do, however, is point to its own role in bringing about such delay. In its reply briefing in support of its petition, the Petitioner points to a cavalcade of delays attributable to JAG in the months leading up to the filing of this petition. To wit:

- Three changes in counsel [doc. 21, at 3];
- Lack of cooperation, leading to the issuance of a subpoena duces tecum [*id.* at 4];
- Delay in the production of digital copies of requested documents [*id.*];
- Failure to produce deponents voluntarily [*id.*];
- Delay in consolidated complaint filing to pursue settlement [*id.* at 5]; and
- Delay in administrative hearing to pursue settlement [*id.*].

Case No. 1:12-CV-726
Gwin, J.

JAG fails to respond to these allegations.  Further, the Petitioner's allegations of delay find a basis in the record.  *See* doc. 36-2.

Equitable relief in this case would be just and proper even absent these alleged delays.  In *Frye ex rel. NLRB v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993), the Sixth Circuit granted a § 10(j) injunction in the face of a similar delay.  In that case, the petitioner's offered reasons in support included the erosion argument made by the Petitioner here.  Although the delay between the practice and petition's filing in that case was shorter—fourteen months—this Court is unaware why the addition of a few more months should preclude the award of equitable relief.  JAG has not told this Court why, despite having had multiple opportunities to do so.  *See also Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987) ("Rather than requiring a consideration of the number of days or months which have passed between the issuance of a complaint and the seeking of section 10(j) relief, we believe the appropriate focus is on whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.").

III.  Conclusion

For the foregoing reasons, this Court DENIES the Respondent's motion to dismiss the petition for lack of subject-matter jurisdiction.  This Court also finds reasonable cause to believe that unfair labor practices have been committed in violation of §§ 8(a)(1), (3), and (5) of the NLRA, and that the injunctive relief sought by the Petitioner is just and proper.  Accordingly, the petition for § 10(j) relief is GRANTED in its entirety.

IT IS HEREBY ORDERED that pending the final disposition of the matters herein before the National Labor Relations Board, the Respondent, and its officers, agents, representatives,

Case No. 1:12-CV-726
Gwin, J.

servants, employees, attorneys, and all persons acting in concert or participation with them, be and they hereby are, enjoined and restrained from:

(1)  Telling employees that there will be no union at its Galion, Ohio facility acting as their bargaining representative;

(2)  Promulgating, maintaining and coercively enforcing a rule prohibiting discussion about unions among employees and/or promulgating and maintaining an overly broad no-solicitation or no-distribution policy;

(3)  Terminating and/or refusing to hire employees because they are members of the Unit and/or the Union or because of their Union activities and/or other activities protected under the Act;

(4)  Refusing to recognize and bargain with the Union as the exclusive bargaining representative of its employees in the Unit during the interim period;

(5)  Making unilateral changes to the Unit employees' wages and/or other terms or conditions of employment without first providing the Union with notice and an opportunity to bargain in good faith to an agreement or impasse over any proposed changes;

(6)  In any like or related matter interfering with, restraining or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

IT IS FURTHER HEREBY ORDERED that pending the final disposition of the matters herein before the National Labor Relations Board or any court of appeals, the Respondent, and its officers, agents, representatives, servants, employees, attorneys, and all persons acting in concert or participation with them, shall take the following affirmative steps within five (5) days of this Order, unless otherwise noted:

Case No. 1:12-CV-726
Gwin, J.

(1) Offer interim reinstatement in writing to all affected employees named in Paragraph 8(L)(ii) of the complaint who lost employment or who were not considered for or offered employment on or about July 1, 2010, without prejudice to their seniority or other rights and privileges previously enjoyed, displacing, if necessary, any employees hired, transferred or reassigned to replace them;

(2) Offer interim reinstatement in writing to employees Natalie Archer, Diana Nolan and Traci Atkins without prejudice to their seniority or other rights and privileges previously enjoyed, displacing if necessary any employees hired, transferred or reassigned to replace them;

(3) Recognize and bargain with the Union as the exclusive bargaining representative of Unit employees during the interim period;

(4) Rescind and cease giving effect to any rule that prevents employees from discussing unions and union activities in the work place during times not associated with patient care or that disparately restricts such discussion;

(5) Upon the Union's request, rescind any and all unilateral changes in wages, hours and working conditions that Respondent implemented for Unit employees at or since the time it took over the operation of the Galion, Ohio facility on or about July 1, 2010, and to restore all wages, hours and terms and conditions of employment to the state they existed on June 30, 2010;

(6) Post copies of this order at Respondent's facility in all places where notices to employees are normally posted, maintain these postings during the Board's administrative proceeding free from all obstructions and defacements, grant all employees free and unrestricted access

Case No. 1:12-CV-726
Gwin, J.

to said postings, grant to agents of the Board reasonable access to said postings and to Respondent's facility to monitor compliance with this posting requirement, and mail copies of this order to all former bargaining unit employees terminated or not hired between June 30, 2010 and July 13, 2010;

(7) Within ten (10) days of this order, hold a meeting or meetings at Respondent's facility, scheduled to ensure the widest possible attendance, at which this order is to be read to the employees by James Griffiths in the presence of a representatives of the Board and the Union or, at the Respondent's option, have a Board agent read the order in Griffith's presence.

(8) Within twenty (20) days of the issuance of this order, file with the Court and serve upon the Regional Director of Region 8 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which the Respondent has complied with the terms of the order, including the location(s) of the posted documents.

This case is hereby CLOSED. However, this Court has continuing jurisdiction regarding the enforcement of this Order.

IT IS SO ORDERED.

Dated: October 16, 2012                    s/        *James S. Gwin*
                                           JAMES S. GWIN
                                           UNITED STATES DISTRICT JUDGE